UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JAMES JOSEPH THOMPSON,<br><br>Defendant. | 4:15-CR-40107-KES<br><br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

Defendant James Joseph Thompson is before the court on a second superseding indictment charging him with possession with intent to distribute methamphetamine on or about August 26 and 27, 2015, in violation of 21 U.S.C. §§ 841(a)(1).   See Docket No. 101.  Mr. Thompson now moves the court to suppress physical evidence seized pursuant to an August 25, 2015,  state court search warrant issued in Sioux Falls, South Dakota, for Mr. Thompson's residence; an August 27, 2015, state court search warrant issued in Luverne, Minnesota, for a storage unit rented by Mr. Thompson; and all evidence deriving from those warrants.  See Docket Nos. 78 and 78-1.  The United States of America ("government") resists the motion.  See Docket No. 79.  This motion has been referred to this magistrate judge for the holding of an evidentiary hearing and the issuance of a recommended disposition pursuant to 28 U.S.C.

§ 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, District Judge.  The following is this court's recommended disposition.

## FACTS

An evidentiary hearing on this matter was held on May 5, 2015.[1] Mr. Thompson was present along with his lawyer, Mr. Jeff Larson.  The government was represented by its Assistant United States Attorney, Jennifer Mammenga.  One witness testified at the hearing and three exhibits were received into evidence.[2]  From this evidence the court makes the following findings of fact.

Mr. Thompson took up residence at 1009 N. Lowell Avenue in Sioux Falls at least by 2012.  The city of Sioux Falls does not provide municipal garbage pick-up, so its residents must contract with private garbage services of their choice.   On July 9, 2015, the Sioux Falls Police Department ("SFPD") received an anonymous Crime Stoppers[3] tip that identified Mr. Thompson as a drug dealer (methamphetamine and marijuana).  SW Aff., ¶ 3.  The tipster indicated Mr. Thompson was dangerous, and that he received the drugs at his home

---

[1] References to the transcript of the evidentiary hearing will be by "TR" followed by the appropriate page number.

[2] The Sioux Falls search warrant documents were collectively marked as Exhibit 1.  The affidavit is most pertinent to this discussion, so it will be referred to as "SW Aff." Followed by the appropriate paragraph number, rather than a generic reference to Exhibit 1.

[3] Crime Stoppers is a way in which the public can anonymously assist law enforcement via the internet or phone call.  If a tipster's information leads to an arrest, he or she may be eligible for a cash reward.  See http://www.crimestopperssiouxempire.com/ (last checked May 6, 2016).

through the mail.  Id.  The tipster provided a physical description of

Mr. Thompson as well as his address, phone number, and a description of his

gray Honda Civic with a South Dakota license plate.  Id., ¶ 2.

On August 10, 2015, SFPD Detectives Nick Cook and Terrance Matia

surveilled Mr. Thompson's residence.  They observed a gray Honda with a

South Dakota license plate in the driveway.  Id. ¶ 4.  They discovered the gray

Honda, along with another vehicle they observed in the driveway, was

registered to Mr. Thompson.  Id.  Other SFPD records revealed Mr. Thompson

resided at the 1009 N. Lowell address.  Id., ¶ 5.  The detectives also observed

an A-Ok Garbage Service ("A-Ok") trash can sitting in front of Mr. Thompson's

house.  Id., ¶ 4.  Detective Matia described the garbage can as sitting in the

driveway between the garage's main door and pedestrian door.[4]

On Friday, August 14, Detective Matia contacted A-Ok Garbage Service.

A-Ok confirmed it provided trash service for Mr. Thompson and that

Mr. Thompson's regular trash day and time was Tuesday between 6:00 and

6:30 a.m.  Id., ¶ 6.  On August 17, 2015, Detective Matia contacted A-Ok to

arrange for a controlled collection of Mr. Thompson's trash the next day.  Id.,

¶ 7.

On Tuesday, August 18, 2015, Detective Matia contacted A-Ok at 5:40

a.m. to confirm when the trash collector would be at Mr. Thompson's house.

---

4 The house has a double garage with both a garage door and a pedestrian door
entrance into the garage.  An oversized driveway with an extra parking pad on
the right sits in front of nearly one half of the home.  A sidewalk passes in front
of the pedestrian door, in front of a large picture window, and then to the
cement front step which is approximately in the center of the home and which
appears to be the main entrance to the home.  See Exhibits A & B.

Id., ¶ 8.  Detective Matia met the A-Ok driver near  Mr. Thompson's house at approximately 6:12 a.m.  Id. Detective Matia testified that on this day, the trash can was again placed on the driveway but more toward the center of the driveway in front of the garage door rather than the pedestrian door.  When asked specifically if the trash can was placed in the same way as when he conducted surveillance, Detective Matia described it as "all in the same area." Detective Matia watched the trash collector roll the trash can down Mr. Thompson's driveway and empty its contents into the A-Ok truck.  Id. There was no other trash in the collection area of the truck at the time Mr. Thompson's trash was placed into the truck.  Id.  Detective Matia then followed the A-Ok driver and retrieved Mr. Thompson's trash from the A-Ok truck.  Id.  Mr. Thompson's trash consisted of three white bags, each tied at the top.  Id. at ¶ 9.

Those three bags were taken back to the Minnehaha County Sheriff's Office and searched.  Id.  Numerous items considered by Detective Matia to be indicative of illegal drugs were recovered.  Id. at ¶ 10.  Detective Matia photographed these items and/or placed them into the Sioux Falls Police Department crime lab as evidence.  Id. at ¶ 12.

Detective Matia made arrangements with A-Ok to conduct another trash pull the following week on August 25, 2015.  Id. at ¶ 19.  Detective Matia testified that on that day, the collector was a different individual than the previous week.  Detective Matia met the garbage collector near Mr. Thompson's home at approximately 6:00 a.m. on that day.  SW Aff.  at ¶ 20.  At 6:29 a.m.

Detective Matia observed the trash collector bring the trash can down Mr. Thompson's driveway and empty it into the A-Ok truck.  Id.  Again, there was no other garbage in the A-OK truck when Mr. Thompson's trash was dumped.  Id. This time, there were four white bags with hand-tied knots.  Id. at ¶ 21.  Again, the bags were taken back to the Law Enforcement Center and searched, and again, items which Detective Matia believed to be indicative of illegal drugs were found.  Id. at ¶ 22.  This time, however, there were also documents related to a Sioux Falls storage unit rented to Mr. Thompson.  Id. at ¶ 23.

Based on the information found in the trash pulls and other information received by Detective Matia, he applied for and received from a state court judge a search warrant for Mr. Thompson's residence, vehicle, and storage unit on August 18, 2015.  See EX 1.  During that search, law enforcement found a large amount of cash, drugs, and drug paraphernalia.  The items found during the Sioux Falls search gave rise to application for a search warrant that was granted by a state-court judge in Luverne, Minnesota, on August 27, 2015, for a storage unit in Luverne.

Mr. Thompson now moves to suppress all physical evidence taken pursuant to both the Sioux Falls and the Minnesota search warrants, including evidence from his house, his vehicles and his storage unit.  See Docket Nos. 78 and 78-1.  He asserts the evidence taken from the storage unit in Minnesota is fruit of the poisonous tree.  Id.  The basis for Mr. Thompson's motion is the putative illegality of the trash pull.  Without the evidence from the trash pull,

5

Mr. Thompson argues, there was no probable cause for the issuance of the first search warrant.  Mr. Thompson further argues that without the evidence found during the trash pull and subsequent search of his home, there would have been no probable cause for the Minnesota search warrant.  At the beginning of the suppression hearing, Mr. Thompson also requested a <u>Franks</u> hearing, asserting that Detective Matia made material misrepresentations or omissions which affected the validity of the Sioux Falls warrant.

The government resists Mr. Thompson's motion in its entirety.  <u>See</u> Docket No. 79.  The government asserts that the trash pull was legal, that Detective Matia made no material misrepresentations in the search warrant affidavit,[5] and that even if the trash pull was not legal, police relied in good faith on the validity of the warrant, thus negating the application of the exclusionary rule to the evidence seized.  The court analyzes each of the relevant issues below.

## DISCUSSION

### A.    Mr. Thompson is Not Entitled to a <u>Franks</u> Hearing.

A defendant is only entitled to a <u>Franks</u>[6] hearing if he makes a substantial showing that an affiant to a search warrant application knowingly or intentionally, or with reckless disregard for the truth, made false statements or omitted material facts and that the alleged statements were necessary to a

---

5 This issue was not discussed in the government's brief because Mr. Thompson raised and argued it for the first time at the evidentiary hearing.

6<u>Franks v. Delaware</u>, 438 U.S. 154 (1978).

finding of probable cause.  <u>Franks v. Delaware</u>, 438 U.S. 154, 155-56 (1978).

"Whether [the defendant] will prevail at that hearing is, of course, another

issue." <u>Id.</u> at 172.

The right under the Fourth Amendment to be free from unreasonable

searches and seizures is a fundamental one and must be safeguarded from

police overreaching.  The probable cause requirement for search warrants

"would be reduced to a nullity" if a criminal defendant did not have recourse to

a hearing before a reviewing judge to challenge the veracity of a search warrant

affidavit.  <u>Id.</u> at 168.  Because a pre-search proceeding is necessarily *ex parte*

and is often done in haste, it "is likely to be less vigorous... [because] [t]he

magistrate has no acquaintance with the information that may contradict the

good faith and reasonable basis of the affiant's allegations." <u>Id.</u> at 169.

Nevertheless, "[t]he requirement for a substantial preliminary showing is

not lightly met." <u>United States v. Mathison</u>, 157 F.3d 541, 548 (8th Cir. 1998).

Minor omissions or discrepancies will not suffice.  <u>United States v. Arnold</u>, 725

F.3d 896, 898 (8th Cir. 2013).  Here, the court understands that the factual

misrepresentation being alleged by Mr. Thompson is the description of the

location of the garbage can on the days of the two trash pulls.  As this court

understands it, Mr. Thompson takes issue with Detective Matia's testimony

during the evidentiary hearing that, when he surveilled Mr. Thompson's home,

the trash can was located near the garage's pedestrian door, but on the trash

pull days, the trash can was placed more toward the center of the driveway, in front of the actual garage door.  See TR at 16.[7]

The important factor for determining the validity of the search warrant, however, is the information that was placed before the judge who approved the search warrant.  A review of the search warrant affidavit reveals that Detective Matia said the garbage can was "in front of the residence" when he surveilled the house on August 10th.[8]  SW Aff. at ¶ 4.  On the trash pull days, Detective Matia told the search warrant judge the A-Ok representative rolled the trash can "from the driveway of the residence to the garbage truck."  See  SW Aff. at ¶¶ 8 and 20.  Viewing the photos which were marked as evidence during the suppression hearing (EX A & B) the court does not perceive the two descriptions ("the front of the residence" and "from the driveway") as being inaccurate or materially different from each other.

During his own testimony, Mr. Thompson testified he always leaves the garbage can closer to the pedestrian door to the garage, even on garbage days. Exhibits A and B demonstrate this entire area is part of a concrete pad that serves as an extra-large driveway and extends from past the far end of the garage to part way in front of the picture window.  The picture window is

---

7 This court did not interpret Detective Matia's testimony to mean the can was closer to the street on garbage pickup days. Mr. Thompson testified he did not move the can on trash day but "let them come all the way up to the house and grab it."  TR at 35.  This leads the court to believe that perhaps Mr. Thompson interpreted Detective Matia's testimony differently.

8 The court notes that August 10, 2015, fell on a Monday.  Detective Matia testified Mr. Thompson's garbage day was Tuesday.  It is apparent, therefore, that Mr. Thompson at least occasionally put his garbage can out the day before his garbage pickup.

between the garage's pedestrian door and the cement steps which lead to the front entrance of the home.  The sidewalk to the front door passes in front of the picture window that is between the garage's pedestrian door and the front door.  If a guest parked on the extra parking pad, upon alighting from the vehicle the passenger could see into Mr. Thompson's picture window if the curtains were open.

Assuming then that the garbage can was at all times where Mr. Thompson says it was, describing it as at the "front of the residence" or on "the driveway" would be accurate and neither description can be characterized as knowingly, intentionally, or recklessly in disregard of the truth.  Finally, as is described in more detail below, this court believes that probable cause for the warrant would exist even if all evidence from the trash pull were excised from Detective Matia's affidavit.  A <u>Franks</u> hearing is therefore not warranted.

**B.    Legality of Trash Pull**

### 1.    Recent Cases Applying Two Different Fourth Amendment Tests

The Fourth Amendment prohibits unreasonable searches without a search warrant supported by probable cause.  <u>See</u> U.S. CONST. AMEND. IV.  The preeminent case involving the Fourth Amendment and trash pulls is <u>California v. Greenwood</u>, 486 U.S. 35 (1988).  In <u>Greenwood</u>, police had information indicating Billy Greenwood might be involved in drug trafficking out of his home, including police surveillance showing numerous vehicles making short-term stops at Greenwood's home late at night and into the early morning hours.  <u>Greenwood</u>, 486 U.S. at 37.  Thereafter, police asked the regular trash

9

collector to collect trash bags Greenwood left on the curb in front of his home and turn it over to police.  Id.  The collector did so and police rummaged through Greenwood's trash without a warrant, finding items indicative of drug use.  Id. at 37-38.  This information was then included in an affidavit in support of a search warrant.  Id. at 38.  Subsequent execution of the search warrant at Greenwood's home resulted in the discovery of cocaine and hashish. Id.

Greenwood was arrested and posted bond.  Id.  After police received continuing reports of late-night, short-term visitors to Greenwood's house, they conducted another trash pull in the same manner as the first, and with the same results.  Id.  Police obtained another search warrant for Greenwood's home which, when executed, resulted in the discovery of more evidence of drug trafficking.  Id.  Greenwood moved to suppress the fruits of the trash pulls, including the fruits of the search warrants because they were based, in part, on the evidence from the trash pulls.  Id.

The Court explained Fourth Amendment protections apply only where (1) Greenwood had a subjective expectation of privacy in the thing seized or place searched and (2) that expectation of privacy was one that society accepted as objectively reasonable.  Id. at 39.  The Court accepted Greenwood's representation that he had a subjective expectation of privacy.[9]  Id.  However,

---

[9] Greenwood pointed to the fact that he placed the garbage in opaque bags, expected that the garbage collector would pick up his garbage and mingle it with the garbage of others, that the garbage would be deposited at the landfill, and that the garbage sacks would remain on the curb for a very short time. Greenwood, 486 U.S. at 39.

the Court ruled that Greenwood's expectation was not one society would accept as objectively reasonable.  Id. at 40.

The Court stated:  "It is common knowledge that plastic garbage bags left on or at the side of a public street are readily accessible to animals, children, scavengers, snoops, and other members of the public."  Id.  "Moreover, [Greenwood] placed [his] refuse at the curb for the express purpose of conveying it to a third party, the trash collector, who might himself have sorted through respondents' trash or permitted others, such as the police, to do so." Id.  Therefore, the Court reasoned that "having deposited [his] garbage 'in an area particularly suited for public inspection and, in a manner of speaking, public consumption, for the express purpose of having strangers take it,' [Greenwood] could have no reasonable expectation of privacy in" his garbage. Id. at 40-41 (quoting United States v. Reicherter, 647 F.2d 397, 399 (3d Cir. 1981)).

Greenwood argued the evidence seized from his trash should be suppressed because, although perhaps legal on Fourth Amendment grounds, it was illegal under California state law.  Greenwood, 486 U.S. at 43.  He argued that society—at least in California—would recognize his privacy interest in his garbage as objectively reasonable because the California Supreme Court has held that citizens have a right of privacy in their garbage.  Id.  The Court soundly rejected this state-law approach to the Fourth Amendment, stating that "whether or not a search is reasonable within the meaning of the Fourth

11

Amendment [does not] depend[] upon the law of the particular State in which the search occurs."  Id.

The Greenwood Court analogized Greenwood's interest in his trash to the numbers one dials on a telephone to talk to another person—when one conveys that data to a third party, "even in [one's] own home or office," one loses Fourth Amendment protection for that data.  Id. at 41.  Although Greenwood was decided before the advent of today's pervasive internet access and smart phone technology, its reference to pen registers (devices that capture the phone numbers dialed from a suspect's phone), was prescient as much of the more-recent Fourth Amendment cases have had to decide how far to stretch that pen register analogy.

In United States v. Jones, 565 U.S. ___, 132 S. Ct. 945, 948 (2012), the Court determined whether the attachment of a global-positioning system (GPS) tracking device to a suspect's car for 28 days constituted a search under the Fourth Amendment.  Jones moved to suppress the evidence obtained from the GPS device.  Jones, 132 S. Ct. at 948.  The Court held that the attachment of the GPS device to Jones' car--which it characterized as "a physical intrusion" and occupation "of private property for the purpose of obtaining information"--constituted a "search" under the Fourth Amendment.  Id. at 949.

The Jones Court held that the Fourth Amendment was founded upon property rights, citing an 1765 English case familiar to the Founding Fathers in which Lord Camden said, "[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave; if he

12

does he is a trespasser, though he does no damage at all; if he will tread upon his neighbour's ground, he must justify it by law." Id. (quoting Entick v. Carrington, 95 Eng. Rep. 807 (C.P. 1765)).

The government attempted to justify its use of the GPS device by arguing that Jones had no privacy interest in the undercarriage of his car nor in the public roads on which that vehicle traveled. Id. at 950. Although the Court noted that later Fourth Amendment cases from the Court "deviated from [the earlier] exclusively property-based approach," the Court viewed its role as ensuring, at a minimum, that the trespass theory of privacy accepted by the Founding Fathers at the time the Fourth Amendment was adopted was protected. Id.

The Court noted its decisions which did not rely upon a property-rights basis for its holdings, nevertheless did not repudiate or "snuff out" the trespass approach. Id. (discussing Katz v. United States, 389 U.S. 347 (1967); Minnesota v. Carter, 525 U.S. 83 (1998); and Soldal v. Cook County, 506 U.S. 56 (1992) (both discussing Katz)). The Court distinguished two cases it previously decided involving the attachment of beepers to property, noting that in one case the suspect never challenged the installation of the beeper while in the other case the beeper had been installed with the consent of the owner. Id. at 952 (distinguishing Kyllo v. United States, 533 U.S. 27 (2001); and United States v. Knotts, 460 U.S. 276 (1983)).

When the government attempted to justify its search under the "open fields" doctrine, the Court soundly rejected that rationalization, noting that "an

13

open field, unlike the curtilage of a home, . . . is not one of those protected areas enumerated in the Fourth Amendment." Id. at 953.  The Court concluded that the trespass approach was still valid where there was actual encroachment onto physical property, but that the Katz reasonable-expectation-of-privacy test would still apply where there was no physical trespass.  Id.  Justice Sotomayer concurred in the four-Justice majority opinion and, in particular, its application of a trespass-based approach in concluding that a search occurred under the Fourth Amendment in the Jones case.  Jones, 132 S. Ct. at 954-57 (Sotomayer, J., concurring).  She wrote separately to discuss theoretically the approach to apply when no physical intrusion takes place, such as with electronic signals from our cell phones, a subject that came before the court in 2014.  Id.  See Riley v. California, 573 U.S. ___, 134 S. Ct. 2473 (2014).

But before the Court decided Riley, it decided a major curtilage case.  See Florida v. Jardines, 569 U.S. 1, 133 S. Ct. 1409 (2013).  In Jardines, the police received an unverified tip that Jardines was growing marijuana in his home. Id. at 1413.  Although police surveilled Jardines' home for a short time, they saw nothing suspicious:  no people came or left the home and police could not see inside the home because the shades were drawn.  Id.  Rather immediately, then, police subjected Jardines' front porch to a drug-dog sniff and the dog alerted to the base of the front door of Jardines' home.  Id.  Police then used the information from the drug dog sniff to obtain a search warrant for Jardines' home, finding marijuana plants inside.  Id.

14

The Court observed that the <u>Katz</u> reasonable-expectation-of-privacy test added to, but did not obliterate, the Court's traditional trespass-based approach to the Fourth Amendment.   <u>Id.</u> at 1414.  The Court held that police had trespassed in an area of Jardines' home protected by the Fourth Amendment.  <u>Id.</u>

The Fourth Amendment protects not only the home, but its curtilage, defined as that area "immediately surrounding and associated with the home." <u>Id.</u>  The Court stated the home and its curtilage form the "very core" of the values protected by the Fourth Amendment.  <u>Id.</u>  The Fourth Amendment's protection of the home would mean little "if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity" or "if the police would enter a man's property to observe his repose from just outside the front window."  <u>Id.</u>  Thus, the Court held that the curtilage is "intimately linked to the home, both physically and psychologically," and is therefore a location where "privacy expectations are most heightened."  <u>Id.</u> at 1415.

Having determined that police entered Jardines' curtilage, the Court turned to the question whether "it was accomplished through an unlicensed physical intrusion."  <u>Id.</u>  The Court held that Jardines had neither explicitly nor implicitly given the officers license to enter his curtilage.  <u>Id.</u>  A license may be implied from "the habits of the country," and the Court acknowledged that a license exists "to approach the home by the front path, knock on the front door, wait briefly to be received, and then leave promptly if not invited to linger longer."  <u>Id.</u>  However, the court noted that the police did not enter upon

15

Jardines' front porch alone, but brought a drug-sniffing dog with them and employed the dog.  Id. at 1416.  This, the Court held, was "something else" and that there was no customary invitation for that activity.  Id.  The Court distinguished knocking on the door from "exploring the front path with a metal detector" or "marching" a "bloodhound into the garden"—activities that would inspire most home-owners to call the police.  Id.  Notably, the Court stated that the "scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose."  Id.  The Court held, therefore, that police had conducted a warrantless search when they conducted the drug-dog sniff on Jardines' front porch.  Id. at 1417-18.

The Court decided Riley in 2014, considering whether a warrantless search of a smart cell phone incident to arrest violated the Fourth Amendment. Riley, 134 S. Ct. at 2480-81.  The Court noted that the search incident to arrest exception from the warrant requirement was supported by two considerations:  (1) to make sure the suspect did not have a weapon within reach with which to injure the arresting officer or later effect an escape and (2) to make sure the suspect did not have access to evidence which he could then destroy.  Id. at 2483 (citing Chimel v. California, 395 U.S. 752, 762-63 (1969), overruled in part Arizona v. Gant, 556 U.S. 332 (2009)).  The Court held that generally, police must obtain a search warrant before searching data on cell phones taken from a suspect incident to his arrest.  Id. at 2485.

The Court first noted that electronic data stored on a cell phone cannot be used as a weapon against the arresting officer nor as a device for later

16

escape.  Id.  Therefore, the Court concentrated on the evidence-destruction prong of Chimel, addressing the government's arguments that the data on cell phones are subject to remote wiping and encryption.  Id. at 2486.  The Court rejected these justifications for routine searches of cell phone data, noting that there was no evidence that the practices were prevalent, that no evidence that allowing a warrantless search would alleviate these problems, and that remote wiping could be prevented by removing the phone's battery or placing the phone in a Faraday bag, a bag made of aluminum foil, preventing radio waves from reaching the phone.  Id. at 2486-87.

Key to the Court's decision was the quantitative and qualitative difference between cell phones and other physical objects that might be taken from a suspect incident to arrest.  Id. at 2489-91.  The Court noted the "immense storage capacity" of smart phones—a person would have to haul a trunk to carry all the pictures, books, articles, and mail carried on a cell phone.  Id. at 2489.  Also, the Court noted that the storage capacity of a smart phone carried interrelated privacy consequences:  by collecting in one place many different kinds of information—"an address, a note, a prescription, a bank statement, a video"—that collection of data revealed much more about a person in combination "than any isolated record."  Id.  Further, the Court noted that even discrete items on a cell phone were imbued with many digital details that would be lacking from their analog counterparts:  a series of digital photos reveals the date, location and description associated with each photo and a digital phone contact reveals each and every contact had with that phone

number for the past several months.  Id.  The Court noted the pervasiveness of cell phones—the person not carrying a cell phone today is the notable person, and those that do carry with them "a cache of sensitive personal information" about themselves.  Id. at 2490.

The Court also found the information on a smart phone to be qualitatively different—browsing history on an Internet-enabled phone reveals a person's private concerns and interests.  Id.  In addition, GPS-enabled phones can reveal the owner's specific movements down to the minute, within very discrete locations.  Id.  Apps on a cell phone also reveal much about the habits and proclivities of their owner.  Id.  Finally, the Court noted that storage of data associated with a smart phone may not even be on the phone itself, but elsewhere.  Id. at 2491.  Accordingly, the Court held that, generally, a search warrant is required before searching a cell phone incident to its owner's arrest. Id. at 2493.

The Eighth Circuit had occasion to apply Greenwood in United States v. Comeaux, 955 F.2d 586 (8th Cir. 1992).  In that case, a deputy sheriff had taken a plastic garbage bag from the top of a garbage can located next to Roberson's garage in the alley.  Comeaux, 955 F.2d at 588.  The deputy never even had to exit his van in order to reach the bag from a seated position inside his van.  Id.  The deputy found incriminating evidence and used the evidence to apply for a search warrant.  Id.  The Eighth Circuit affirmed the district court's refusal to suppress the evidence derivative of the trash pull.  Id. at 589.  The court declined to decide whether the trash was located in the curtilage of

18

Roberson's home, and instead stated that the "proper focus under <u>Greenwood</u> is whether the garbage was readily accessible to the public so as to render any expectation of privacy objectively unreasonable." <u>Id.</u> (quoting <u>United States v. Hedrick</u>, 922 F.2d 396, 400 (7th Cir. 1991).

In <u>United States v. Scott</u>, 975 F.2d 927, 928 (1st Cir. 1992), Scott was the subject of an investigation by the Internal Revenue Service ("IRS"). He shredded documents, placed them in trash bags, and placed the bags outside the curtilage of his home on the curb for garbage pick-up. <u>Id.</u> The IRS retrieved the bags, and "painstakingly pieced together" incriminating evidence. <u>Id.</u> After being indicted, Scott moved to suppress evidence from the trash pull. <u>Id.</u> Seeing the case as a straightforward application of <u>Greenwood</u>, the court rejected Scott's argument. <u>Id.</u> at 928-29. Scott had deposited the trash in a public place and left it for collection. <u>Id.</u> at 929. Therefore, the court held he had abandoned his trash and had no reasonable expectation of privacy in it at the time the IRS took it. <u>Id.</u> Shredding the documents before abandonment made no difference to the court: "What we have here is a failed attempt at secrecy by reason of underestimation of police resourcefulness, not invasion of constitutionally protected privacy." <u>Id.</u> at 930.

In <u>United States v. Segura-Baltazar</u>, 448 F.3d 1281, 1284-85 (11th Cir. 2006), police conducted trash pulls at defendant's home on nine occasions. On seven of those occasions, the trash was picked up by a regular trash collector (accompanied by a police officer) out at the edge of the property three to six feet away from the curb. <u>Id.</u> at 1284. The trash was bagged and inside large

garbage cans covered with lids.  Id.  On two occasions, however, there were bags of trash sitting to the left side of the residence near the garage.  Id.  On these occasions, the trash collector knocked on the door, verified with the resident of the house that they wanted the trash set next to the garage collected, and then picked up that trash.  Id. at 1284-85.  Incriminatory information from the trash pulls was used to support a search warrant for the house.  Id. at 1285.

The Eleventh Circuit held that the seven trash pulls from the curbside were controlled by the holding in Greenwood and the court "readily affirm[ed]" the district court's refusal to suppress this evidence.  Id. at 1286.  The two trash pulls from the location near the house presented a "closer question."  Id. Ultimately, the court affirmed the legality of these trash pulls too because the trash was left outside for collection on the customary day, trash had been retrieved by sanitation employees from that location on previous days, and the trash was clearly visible and accessible from the street.  Id.

The Eleventh Circuit specifically pointed out that the record was silent as to whether the two trash pulls took place from the curtilage as the district court had made no finding to that effect.  Id. at 1287.  Furthermore, the court did not address the fact that a resident of the home had given permission to take the trash next to the house because the district court did not rely on a consent theory and the government did not urge that theory on appeal.  Id. at 1288 n.2.  The court also made clear that its decision should not be considered

"bright-line" precedent for all future garbage pulls near a home as each inquiry was "highly fact-intensive." Id. at 1289.

In United States v. Simms, 626 F.3d 966, 968 (7th Cir. 2010), the Seventh Circuit addressed a trash pull that occurred from wheeled garbage cans located inside a six-foot high opaque fence surrounding the defendant's yard. The city of Milwaukee had an ordinance that, during the winter, garbage carts were not to be placed at the curb, where they might interfere with snow removal. Id. Rather, homeowners were notified by flyers attached to their garbage cans that, during the winter, garbage collectors would remove the garbage from the owner's property. Id. at 968-69. The police pulled the garbage on the regular day for garbage collection for defendant's home. Id. at 968. The city ordinance required that homeowners provide a clear and unhindered path for sanitation workers to access their garbage containers. Id. The gate to defendant's fence had a "no trespassing" sign on it, but the gate was open on the day the police pulled defendant's trash. Id.

Judge Posner analyzed the police action under both the reasonable-expectation-of-privacy rubric as well as the trespass rubric. Id. at 969-71. Under the former, the court held that defendant's subjective expectation of privacy in his garbage under these circumstances could only be realized by violation of the city "snow rules" ordinance. Id. at 969. This, the court held, could not be a reasonable expectation of privacy that society was prepared to recognize because it required violations of law in order to be allowed. Id.

21

As to the trespass model, the court noted that the police had a license to do whatever trespass the garbage collectors were licensed to accomplish. Id. Because the garbage collectors were authorized to enter defendant's fence when the gate was open and collect his trash, so too could the police. Id. at 969-70.

The court assumed that the defendant's trash was on his curtilage, although the district court's decision did not make that clear. Id. at 970. The court also acknowledged that people have a strong interest in excluding strangers from their home, and "a similar interest in excluding strangers from" their curtilage. Id. "But the fact that the defendant's garbage carts were . . . within the curtilage of his home does not conclude the constitutional analysis." Id. The court concluded that "[b]y leaving the gate open when winter rules were in force, without notice that the garbage collectors were not to enter—a notice they would not be bound to obey because it would violate the ordinance—the defendant allowed a reasonable person to think that nothing private was going on in his yard because he could expect the garbage collectors to enter it and wheel away the carts, consistent with the winter rules of which all homeowners were notified." Id. at 970-71.

As the above law demonstrates, in cases where no trespass on private property occurred, courts have applied the Katz reasonable-expectation-of-privacy test. See e.g. Greenwood, 486 U.S. at 40-41; Segura-Baltazar, 448 F.3d at 1286 (for the seven curbside trash pulls); Scott, 975 F.2d at 928-29. The Eighth Circuit's Comeaux decision should be grouped with these non-trespass cases because, in that case, the appellate record contained no factual

finding that the trash was located on the curtilage. <u>Comeaux</u>, 955 F.2d at 589.[10] Thus, the statements in <u>Comeaux</u> about the legality of trash pulls occurring on the curtilage are *dicta*. <u>Id.</u> In cases where the reasonable-expectation-of-privacy test applies, the burden is on the defendant to demonstrate that he had a subjective expectation of privacy and that his expectation is one that society recognizes as objectively reasonable. <u>United States v. James</u>, 534 F.3d 868, 872-73 (8th Cir. 2008).

In Fourth Amendment cases where a trespass on constitutionally protected property has occurred, courts have employed the trespass model. <u>Jones</u>, 132 S. Ct. at 950-53; <u>Jones</u>, 132 S. Ct. at 954-57 (Sotomayer, J. concurring); <u>Jardines</u>, 133 S. Ct. at 1414-18; <u>Simms</u>, 626 F.3d at 969-71 (alternative holding in the event the area did constitute curtilage). Where the government has trespassed onto constitutionally protected property and the search was without a warrant, the government has the burden to justify the legality of the search. <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 455 (1971); <u>United States v. Kennedy</u>, 427 F.3d 1136, 1140 (8th Cir. 2005).

Where trash is outside the curtilage, as in <u>Greenwood</u>, no trespass occurs in retrieving the trash. A privacy interest, if one exists, must be demonstrated in the *trash itself*. Efforts by defendants to demonstrate such an interest have been unavailing. <u>Greenwood</u>, 486 U.S. at 40-41; <u>Segura-</u>

---

[10] It seems fairly apparent that the trash pulled in <u>Comeaux</u> was ***not*** in the curtilage: the bag police took was on top of the garbage receptacle lid, not in the receptacle; the receptacle was in the alley behind the house; the officer was able to reach the bag and take it without ever leaving his seat inside his vehicle; and the area was immediately adjacent to a throughway for vehicle traffic. <u>Comeaux</u>, 955 F.2d at 589.

<u>Baltazar</u>, 448 F.3d at 1286; <u>Scott</u>, 975 F.2d at 928-29; <u>Comeaux</u>, 955 F.2d at 589.

However, where a trespass onto constitutionally protected property occurs, the privacy interest is taken as a given and the question is whether a license exists that excuses the trespass and, if so, if police exceeded that license. <u>Jardines</u>, 133 S. Ct. at 1414-18; <u>Simms</u>, 626 F.3d at 969-71. While the mere conclusion that a trespass onto the curtilage of a home occurred is not dispositive of the Fourth Amendment issue, neither is it dispositive that the object retrieved from the curtilage was trash. <u>Simms</u>, 626 F.3d at 969-71.

### 2.    Application of the Trespass Model to Mr. Thompson's Case

"Unreasonable searches or seizures conducted without a warrant at all are condemned by the plain language of the" Fourth Amendment and "the sanctity of a man's home and the privacies of life" are at the heart of that amendment. <u>Payton v. New York</u>, 445 U.S. 573, 585 (1980). The "overriding respect for the sanctity of the home" is "embedded in our traditions since the origins of the Republic." <u>Id.</u> at 601. The "curtilage is the area to which extends the intimate activity associated" with the home and has been extended protection equal to the home itself under the Fourth Amendment. <u>Oliver v. United States</u>, 466 U.S. 170, 180 (1984).

"[F]or most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage—as the area around the home to which the activity of home life extends—is a familiar one easily understood from our daily experience." <u>Id.</u> at 182 n.12. Four factors are considered to

24

determine whether an area falls within the home's curtilage: (1) the proximity of the area to the home; (2) inclusion of the area within an enclosure surrounding the home; (3) the nature of the uses of the area; and (4) steps taken by the resident to protect the area from observation by persons passing by.  United States v. Dunn, 480 U.S. 294, 301 (1987).  The Dunn factors are tools to help courts determine the "centrally relevant consideration–whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection."  Id.

Since Jardines, lower courts that have examined whether a driveway (as opposed to a front porch where a drug sniffing dog is in tow, as in Jardines) constitutes curtilage have cautioned that proximity to the home is only one of the four factors to consider, and proximity alone does not curtilage make.  For example, in United States v. Beene, 2016 WL 890127 , ___ F.3d ___ (5th Cir. March 8, 2016), the Fifth Circuit determined the defendant's driveway was not a part of the curtilage of his home.  Id. at *4-5.

Mr. Beene was suspected of pointing a gun at people on a city street in Louisiana.  Beene, 2016 WL 890127 at *1. City police officers located Mr. Beene just as he was parking in his own driveway.  Id.  The officers parked their patrol cars on the street.  Id. They arrested Mr. Beene and searched his car (still parked in his own driveway) after a drug dog sniff, but without a warrant or consent.  Id. at * 2.  Mr. Beene asserted the dog sniff violated his Fourth Amendment rights because his car was parked in his driveway, which he claimed was within the curtilage of his home, citing Jardines.  Id. at * 4.

The Fifth Circuit analyzed the <u>Dunn</u> factors but decided the driveway was not within Mr. Beene's curtilage.  <u>Id.</u> at * 4-5.

"[O]nly the driveway's proximity to the residence weighs in favor of a finding that it was part of the curtilage of the home.  The driveway was open and could be observed from Greer Street.  Although fences encircled part of the driveway, nothing blocked its access or obstructed its view from the street.  Finally, neither Beene nor [his wife] took steps to protect their privacy such as posting 'no trespassing' signs."  <u>Id.</u> at * 4.  The court concluded that the driveway, though it was in the middle of town, was more like an "open field" than curtilage, and therefore, unlike <u>Jardines,</u> the officers did not implicate the Fourth Amendment by bringing the drug dog onto Mr. Beene's driveway.  <u>Id.</u> at * 5.

Other post-<u>Jardines</u> cases that do not involve a drug dog sniff have reached the same conclusion regarding whether an un-obstructed driveway constitutes curtilage.  <u>See</u> <u>e.g.</u>, <u>United States v. Dooley</u>, 2013 WL 2548969 at * 1 (N.D. Ga., June 10, 2013) (citing the <u>Dunn</u> factors and finding driveway was not curtilage because even though it was "right next to the garage door of the house" the driveway was not enclosed or covered and there was no evidence it was used for any activity of home life); <u>United States v. Rojas</u>, 2014 WL 5107052 at * 6 (N.D. Iowa, October 3, 3014) (citing the <u>Dunn</u> factors but finding the driveway was not within the curtilage even though it was "not particularly far from the home" because it was not enclosed and there were no efforts to protect it from observation by passersby); <u>United States v. Owens</u>,

26

2015 WL 6445320 at * 7-8 (D. Maine, October 23, 2015) (applying the <u>Dunn</u> factors but finding the upper driveway next to the garage[11] was not curtilage because it was not enclosed in any way and was exposed to public view—proximity to the home was not enough).

Under the particular facts of this case, the court finds that the area from which the A-OK route driver retrieved Mr. Thompson's trash and gave it to Detective Matia was not within the curtilage of Mr. Thompson's home.  It was on the driveway, near the pedestrian garage door of Mr. Thompson's home.  Furthermore, it could easily be seen from the street.  The Court has cautioned that police may not "enter a man's [curtilage] to observe his repose from just outside the . . . window."  <u>Jardines</u>, 133 S. Ct. at 1414.  It could be argued that because the location of the garbage can was a mere few feet from the picture window, it should be considered curtilage.  But the entire area is quite compact and it is all very visible from the street.  The guest parking space is also in close proximity to the picture window, and anyone who happened to park on or traverse it (delivery drivers, the mail carrier, and the garbage man, for example) would be able to see in if the curtains were open.

The area where the garbage can sat was not separated from the dwelling by a fence, outbuilding, or great expanse of open land.  <u>Oliver</u>, 466 U.S. at 182 (citing <u>United States v. Van Dyke</u>, 643 F.2d 992, 993-94 (4th Cir. 1981); <u>United States v. Williams</u>, 581 F.2d 451, 453-54 (5th Cir. 1978); <u>Care v. United States</u>,

---

[11] In this case, the police walked onto the driveway to touch the hood of the defendant's car to determine if it was still warm.  They described the car as "parked on the upper part of the driveway with its nose facing the garage."  <u>Id.</u> at *2.

231 F.2d 22, 25 (10th Cir. 1956)).  There was likewise no indication during the hearing or in Detective Matia's affidavit that the access to or view of the garbage can was blocked by any obstacles whatsoever, either on the days Detective Matia surveilled Mr. Thompson's residence or on the two trash pull days.

Even if the garbage cans were on Mr. Thompson's curtilage however, that would not end the inquiry.  This is because the next step is to determine whether there was a license for the A-Ok driver to enter that area and, if so, whether he exceeded the scope of that license.  He did not, neither did Detective Matia.  Jardines, 133 S. Ct. at 1414-18; Simms, 626 F.3d at 969-71.

There is no evidence that on the days of the trash pulls, the  A-Ok driver did not have Mr. Thompson's permission to enter Mr. Thompson's driveway to collect Mr. Thompson's trash as usual.  It is true that if the A-OK driver had done what he ordinarily would have done, Mr. Thompson's trash would have been comingled with the trash of other A-Ok customers and would not have been turned over to Detective Matia.  Once the trash was removed from Mr. Thompson's property, however, Mr. Thompson had no Fourth Amendment privacy interest in it.  See United States v. Biondich, 652 F.2d 743, 745 (8th Cir. 1981) (no expectation of privacy in trash that is removed from curtilage in the usual manner by the garbage hauler, when the property owner had made no special arrangements with the hauler to "keep his trash from public view."). See also, United States v. Cromwell, 586 F.2d 1020, 1025 (homeowner lost

privacy interest in garbage placed for collection when he had not made "some special arrangement for the disposition of his garbage inviolate.").

The court finds the location of the garbage when the trash pulls occurred was not within the curtilage of Mr. Thompson's home, so no Fourth Amendment violation occurred.  Alternatively, even if the trash can was within the curtilage, A-Ok did not exceed its license (so neither did Detective Matia)  in collecting or disposing of Mr. Thompson's trash on August 18 and 25, 2015. The court concludes that under the specific facts presented in this case, the government's trash pull did not violate the Fourth Amendment.

### 3.    Application of the <u>Katz</u> Test to Mr. Thompson

Even if a subsequent reviewing court should find that the trespass model from <u>Jardines</u> and <u>Jones</u> is inapplicable and that the <u>Katz</u> reasonable-expectation test should apply, this court reaches the same conclusion.  First, this court notes that trash, though on a much smaller scale than digital data on a cell phone, consists of a collection all in one place of many disparate kinds of information—"an address, a note, a prescription, a bank statement, a video"—and that collection of data reveals much more about a person in combination "than any isolated record."  <u>Riley</u>, 134 S. Ct. at 2489.  Thus, although the Supreme Court has referred to a subjective expectation of privacy in trash as "unreasonable," there may be instances in which a defendant can reasonably protect a privacy concern in his trash.  Thus, this court is cautious in reaching the conclusion that, once in the trash bin, such caches of potentially information-laden items are automatically fair game for "animals,

children, scavengers, snoops, and other members of the public." <u>Greenwood</u>, 486 U.S. at 40.

The key question asked by courts applying the <u>Katz</u> test is whether the trash was accessible to the public at the time of its pulling.  <u>See</u> <u>Comeaux</u>, 955 F.2d at 589 (stating the "proper focus under <u>Greenwood</u> is whether the garbage was readily accessible to the public so as to render any expectation of privacy objectively unreasonable.").  <u>See also</u> <u>Segura-Baltazar</u>, 448 F.3d at 1286; <u>Scott</u>, 975 F.2d at 928-29.  Here, the trash was on Mr. Thompson's driveway, visible from the street in an area that is very compact.  At least on the day Detective Matia surveilled it, Mr. Thompson put the trash out the day before his pickup day.  Though it was close to the house, it was still very visible from the street and in a very compact area, both relative to the street and the surrounding house (the neighbor's garbage can is also visible in Exhibit A).  Like Billy Greenwood, Mr. Johnson placed his "[his] garbage 'in an area particularly suited for public inspection and, in a manner of speaking, public consumption, for the express purpose of having strangers take it.' " <u>Greenwood</u>, 486 U.S. at 40-41.  Mr. Thompson's garbage was accessible to the public.  Under this alternate analysis, the court concludes that the trash pull did not the Fourth Amendment.

**C.   Whether the Search Warrant Was Supported by Probable Cause Without the Trash Pull Evidence.**

Mr. Thompson asserts the trash pull was illegal, and without the trash pull evidence, there would not have been a sufficient showing of probable cause to support either the South Dakota or the Minnesota search warrants.  Though

this court finds the trash pull did not violate the Fourth Amendment, the validity of the warrant without the trash pull evidence is examined in the event that reviewing courts disagree with this court's finding on the Fourth Amendment issue.

The evidence gleaned from the trash pull is detailed in paragraphs 10, 11, 22, 23, 24 and 25 of the search warrant affidavit. The court therefore examines the evidence that remains to determine whether, excluding the trash pull evidence, the affidavit would have nevertheless presented probable cause to search.

In this case, the search warrant obtained by the officers authorized a search of four things: (1) Mr. Thompson himself, including his urine; (2) Mr. Thompson's residence; (3) Mr. Thompson's vehicles ; and (4) Mr. Thompson's storage unit. See Exhibit 1. The evidence in support of the search warrant (excluding the trash evidence) was as follows:

1. On July 9, 2015 the Sioux Falls Police Department received a Crime Stoppers tip describing Mr. Thompson as a dangerous drug dealer. The caller indicated Mr. Thompson used meth, cocaine and marijuana. The tipster gave a physical description of Mr. Thompson, along with his address and a description of one of his vehicles and his telephone number. The tipster also explained that Mr. Thompson received drugs through the mail and that he used plastic baggies and a digital scale. SW Aff. at ¶¶ 1-3.

2. On August 10, 2015, Detectives Cook and Matia confirmed some of the information received from the Crime Stoppers tip by conducting surveillance on Mr. Thompson's residence. They observed the gray Honda in the driveway, the vehicle which had been described by the Crime Stoppers tip. SW Aff. at ¶ 4.

3. Later, Detective Matia confirmed with South Dakota vehicle registration that the gray Honda was registered to

31

Mr. Thompson and with the Sioux Falls Police Department that Mr. Thompson has resided at 1009 N. Lowell since at least August, 2012.  SW Aff. at ¶ 5.

4. On August 18, 2015, Detective Matia received information from FBI Agent David Keith.  Agent Keith had received information from a Source of Information (SOI) on August 17, 2015, against the SOI's own penal interest.  SW Aff. at ¶ 13.  The SOI had given Agent Keith credible information in the past.[12]  The SOI referred to Mr. Thompson as "Orange" but said his actual first name was probably "James."  SW Aff. ¶ 14.  The SOI described the inside of Mr. Thompson's home in detail, had been inside Mr. Thompson's home as recently as July, 2015.  SW Aff. ¶ 15.  The SOI had ingested methamphetamine while inside Mr. Thompson's home.  The methamphetamine was provided by "James."  SW Aff. ¶ 15.  The SOI described "James" as having a gallon sized zip-lock bag full of methamphetamine, which he stored in the basement of his Lowell Avenue home.  "James" also ingested methamphetamine during the SOI's visit.  SW Aff. ¶ 15.  The SOI indicated "James's" telephone number was the same number which had been provided by the Crime Stoppers caller.  SW Aff. ¶ 2, 15.

5. On August 18, 2015, Detective Matia contacted the Sioux Falls water department.  The city water department representative confirmed that water service for 1009 N. Lowell Ave. had been in Mr. Thompson's name since August, 2012.  SW Aff. ¶ 16.

6. On August 19, 2015, Detective Matia spoke with United States Postal Inspector Derek Ryan.  Inspector Ryan advised that within the past several months 1009 N. Lowell Ave. had received packages from several locations which Inspector Ryan and Detective Matia knew as locations for methamphetamine and marijuana. One of the packages delivered to 1009 N. Lowell by the U.S. Postal Service on July 16, 2015 was from Seattle, Washington and weighed 1 pound, 11 ounces.  SW Aff. ¶ 18.

"When the affidavit supporting the search warrant sets forth facts

sufficient to create a fair probability that evidence of a crime will be found in

---

[12] At the suppression hearing, Detective Matia testified he did not meet personally with the SOI, but that he knew the SOI was not personally facing criminal charges.  TR 32-33.

the place to be searched, probable cause exists." United States v. McIntyre, 646 F.3d 1107, 1115 (8th Cir. 2011) (quoting Unites States v. McArthur, 573 F.3d 608, 613 (8th Cir. 2009) (quoting United States v. Terry, 305 F.3d 818, 822 (8th Cir. 2002))).  See also Illinois v. Gates, 462 U.S. 213, 238 (1983). "Probable cause requires only a showing of fair probability, not hard certainties." United States v. Hudspeth, 525 F.3d 667, 676 (8th Cir. 2008). Whether a search warrant is supported by probable cause is to be determined by considering the totality of the circumstances.  United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007).  The issuing judge's determination of the issue of probable cause should be paid "great deference." United States v. O'Dell, 766 F.3d 870, 873 (8th Cir. 2014).

    Reviewing courts examine the sufficiency of an affidavit in support of a search warrant using "common sense" and not using a "hyper technical" approach. Grant, 490 F.3d at 632 (citing United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (quoting United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993))).  "Where the [issuing judge] relied solely upon the supporting affidavit to issue the search warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." O'Dell, 766 F.3d at 874.  See also Hudspeth, 525 F.3d at 674; United States v. Olvey, 437 F.3d 804, 807 (8th Cir. 2006).

    A defendant seeking to suppress evidence obtained under a regularly issued search warrant has the burden to show by a preponderance of the evidence that the search warrant was not supported by probable cause.  United

33

States v. Chaar, 137 F.3d 359, 363 (6th Cir. 1998); United States v. de La
Fuente, 548 F.2d 528, 534 (5th Cir. 1977).  Cf. Carter v. United States, 729
F.2d 935, 940 (8th Cir. 1984) (generally, burden is on the defendant who
moves to suppress evidence except where the search was without benefit of a
search warrant).

When search warrant affidavits are based upon information supplied by
informants, the question is whether such information is reliable.  Williams, 10
F.3d at 593.

> Information may be sufficiently reliable to support a probable
> cause finding if the person providing the information has a track
> record of supplying reliable information, or if it is corroborated by
> independent evidence.  If information from an informant is shown
> to be reliable because of independent corroboration, then it is a
> permissible inference that the informant is reliable and that
> therefore other information that the informant provides, though
> uncorroborated, is also reliable.

Id. (citing Gates, 462 U.S. at 233-34; Draper v. United States, 358 U.S. 307,
313 (1959)).

Although the credibility and reliability of informants are important
considerations in the probable cause inquiry, "they are not 'separate and
independent requirements to be rigidly exacted in every case.' " Tyler, 238 F.3d
at 1039 (quoting Gates, 462 U.S. at 230)).  That is, an informant's statements
must be weighed in the totality of the circumstances.  Tyler, 238 F.3d at 1039.
Thus, an informant is considered to be reliable and credible if the supplied
information is at least partially corroborated by other sources.  Humphreys,
982 F.2d at 259; see also United States v. Murphy, 69 F.3d 237, 240 (8th Cir.
1995) (court held that search warrant was based on probable cause when the

34

affidavit contained only (1) the informant's statement that the defendant was a recently-released convicted murderer who possessed illegal firearms at his residence and (2) the affiant's statement that he had confirmed the defendant's address and release from prison).  Probable cause may be found, for example, when the information supplied by one informant is consistent with specific details provided by a second, independent informant.  United States v. Fulgham, 143 F.3d 399, 401 (8th Cir. 1998).  Thus, reciprocal corroboration may render informant information reliable and credible enough to support a finding of probable cause.  Id.; United States v. Nieman, 520 F.3d 834, 839-40 (8th Cir. 2008).

Here, the SOI's information and the anonymous Crime Stopper tipster's information was at least partially mutually corroborative.  Fulgham, 143 F.3d at 401.  The information from the SOI informant was also presumptively credible because it was provided against his or her penal interest.  Tyler, 238 F.3d 1038 (an informant's statements against their penal interest are presumptively credible).  See also United States v. LaMorie, 100 F.3d 547, 553 (8th Cir. 1996) (statements against penal interest "carry considerable weight.").

An important consideration in establishing the credibility and reliability of an informant is whether law enforcement had the opportunity to meet personally with the informant to assess his credibility and whether the informant's information is based on first-hand knowledge rather than rumor or innuendo.  Nieman, 520 F.3d at 839-40; see also Wells, 223 F.3d at 839 (court noted that police must engage in suitable corroboration of the informant's

information if the informant's reputation cannot be assessed because the informant is anonymous); United States v. Robertson, 39 F.3d 891, 893 (8th Cir. 1994) (court noted that "there is an inherent indicia of reliability in the richness and detail of first hand observation" by an informant and that the ability of police to question the informant face-to-face gives greater weight to the police's decision to rely on the informant's first-hand observations).   Here, Detective Matia did not meet personally with the SOI, but FBI Agent Keith did, and FBI Agent Keith had previously received reliable information from the SOI. That the SOI had previously provided reliable information lends credibility to the information he/she provided about Mr. Thompson.  Williams, 10 F.3d at 593.

In addition, probable cause may be established by the observations of law enforcement and by circumstantial evidence.  United States v. Wells, 223 F.3d 835, 839 (8th Cir. 2000).  Information received from either or both the SOI and the anonymous Crime Stoppers tipster (Mr. Thompson's phone number and/or his address and description of the 1009 Lowell Avenue home, and that he drove a gray Honda with South Dakota plates, for example) was independently corroborated by Detectives Matia and Cook.  Mr. Thompson's counsel observed during the evidentiary hearing that these facts could be known by anyone and did not necessarily implicate Mr. Thompson in nefarious activity or establish probable cause.  The Eighth Circuit has consistently rejected such arguments.   "Independent corroboration of even innocuous facts makes it more likely that an informant is telling the truth about incriminating

ones, and corroboration of innocent behavior can provide the basis for probable cause." United States v. Ketzeback, 358 F.3d 987, 992 (8th Cir. 2004). See also, United States v. Reiner Ramos, 818 F.2d 1392, 1397, n. 7 (8th Cir. 1987) ("This court . . . has long recognized that the corroboration of minor, innocent details can suffice to establish probable cause."); United States v. Revich, 793 F.2d 957, 960 (8th Cir. 1985) ("The theory connecting reliability and corroboration is that an informant who is correct about some things more likely will be correct about critical, unverified facts, and it is not necessary to a finding of reliability that the corroboration extend to illegal activity as well as innocent details.").

It is clear the search warrant affidavit established probable cause to believe Mr. Thompson was involved in selling drugs, even without the trash pull evidence. The court concludes that the search warrant for Mr. Thompson's person, home and vehicle were supported by probable cause, even excluding the evidence which derived from the trash pull.[13] Thus, the court recommends that Mr. Thompson's motion to suppress be denied on this

---

[13] It is unclear from the information provided to the court whether the search of the home unearthed any information about the location of Mr. Thompson's Minnesota storage unit, independent of the information which was gleaned from the trash pull. Detective Matia testified that after the search of the home, he came to the realization that it was the parent company of the storage facility which was located in Sioux Falls, but the actual storage unit was located in Luverne, Minnesota. TR at 26. Law enforcement in Minnesota therefore applied for and received a warrant to search Mr. Thompson's Minnesota storage unit. Id. If documents found in Mr. Thompson's home led to this conclusion, then the Minnesota storage unit would have inevitably been discovered. But the return is not specific about what documents were found. See Exhibit 1. The court is therefore unable to reach a conclusion about whether there would have been probable cause to search the storage unit absent the trash pull evidence.

ground as well because the evidence listed in Exhibit 1 would have been discovered even if Detective Matia had not rummaged through Mr. Thompson's trash.

**D.      Leon Good Faith Exception**

The government argues that even if the search warrant for Mr. Thompson's home lacked probable cause, the evidence should not be suppressed because police relied in good faith on the state judge's issuance of the warrant.  Although the court has already concluded that the motion to suppress should be denied, in order to provide a complete record, the court also addresses this issue.

Even if an affidavit in support of a search warrant fails to provide probable cause for the issuance of the search warrant, the fruits of the search will not be suppressed if the officer who executed the search warrant relied upon that warrant in objective good faith.  United States v. Ross, 487 F.3d 1120, 1122-1123 (8th Cir. 2007) (citing United States v. Leon, 468 U.S. 897, 921, (1984)).  "When assessing the good faith of the officers, [the court] look[s] to the totality of the circumstances, including any information known to the officers, but not included in the affidavit." United States v. Rodriguez, 484 F.3d 1006, 1011 (8th Cir. 2007).  The question is whether a reasonably well-trained officer would have known that the search was illegal despite the issuing judge's authorization.  Hudspeth, 525 F.3d at 676.

The Leon good-faith exception does not apply in four circumstances: (1) where the affidavit in support of the search warrant is "so lacking in indicia

of probable cause as to render official belief in its existence entirely
unreasonable," (2) when "the issuing magistrate wholly abandoned his judicial
role," (3) when the warrant is "so facially deficient . . . that the executing
officers cannot reasonably presume it to be valid," and (4) when the issuing
magistrate was misled by false information in an affidavit that the affiant
knowingly or recklessly included.  Leon, 468 U.S. at 923 (citations omitted);
United States v. Pruett, 501 F.3d 976, 980 (8th Cir. 2007), vacated and
remanded on other grounds, 552 U.S. 1241 (2008);[14] Ross, 487 F.3d at 1122.

In determining whether a magistrate has wholly abandoned his judicial
role, the court looks for an "indication that the magistrate was biased or
impartial, [or for] evidence of a pattern of passive, automatic issuance of
warrants."  Pruett, 501 F.3d at 980-81 (quoting United States v. Hallam, 407
F.3d 942, 946 (8th Cir. 2005)).  There is no evidence of that here.  There is also
no evidence that Detective Matia misled the state court judge who issued the
warrant by including false information.

Lastly, the court must determine if the affidavit in support of the search
warrant was "so lacking in indicia of probable cause as to render official belief
in its existence entirely unreasonable" or "so facially deficient . . . that the
executing officers cannot reasonably presume it to be valid."  The search
warrant is also not obviously lacking in probable cause if one excises the
information from the trash pull, for the reasons explained above.

---

[14]The Supreme Court vacated the holding in Pruett as to what
constitutes "use" of a firearm during a drug trafficking crime.

The officers, including Detective Matia, would not have acted in bad faith if they had formed the belief that *any* trash pull is legal.  Numerous court decisions have glossed over the intricacies of the Fourth Amendment analysis when it comes to trash pulls.  In particular, here in the Eighth Circuit, there was in existence an opinion stating that trash pulls from the curtilage were legal without analyzing the trespass model of Fourth Amendment analysis.  See Comeaux, 955 F.2d at 589.  See also, Anderson v. United States, 762 F.3d 787, 793 (8th Cir. 2014).  Anderson is a post-Jardines, case, but the Anderson court again cited Comeaux for the proposition that there is no reasonable expectation of privacy in the contents of garbage that is readily accessible to the public, even when the receptacle is located within the curtilage.  Anderson arose in a post-judgment motion to vacate, but the Eighth Circuit found Mr. Anderson's counsel was not deficient for failing to raise the legality of the trash pull in his criminal case, which arose before Jardines was decided.  More importantly here, the Anderson court still declined to definitively state that Jardines "undermined" Comeaux.  Id. at 794.   Given this somewhat muddled state of the Fourth Amendment as to trash pulls in the Eighth Circuit, Detective Matia certainly cannot be faulted for believing he was acting within the boundaries of the Constitution when he searched Mr. Thompson's trash in August, 2015.

Therefore, the court concludes as an alternative holding that the evidence seized from Mr. Thompson's home should not be suppressed because, under Leon, the police were entitled to rely in good faith upon the search warrant issued by the state court judge.

**CONCLUSION**

Based on the foregoing facts, law, and analysis, this court respectfully recommends that Mr. Thompson's motion to suppress [Docket No. 78] be denied in its entirety.

**NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Objections must be timely and specific in order to require de novo review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED May 13, 2015.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge